WATER COMMISSIONERS OF DETROIT (FARRINGTON v.). See Case No. 4,687.

## Case No. 17,257.

### The WATERLOO.

[Blatchf. & H. 114.] [1]

District Court, S. D. New York. Feb., 1830.

ENTRY BY DERELICT VESSEL—CLOSED PORT—FOR FEITURE—PAYMENT OF DUTIES—RATES OF SALVAGE.

1. The acts of April 18th, 1818, and May 15th, 1820 (3 Stat. 432, 602), which provide that the ports of the United States shall be closed against every British vessel coming from a port closed against vessels of the United States, and that every vessel so excluded, which shall enter a port of the United States, shall be forfeited, applies only to a voluntary entry by the act of the owner or master of the vessel, or of their agents.

[Cited in The Cargo ex Lady Essex, 39 Fed. 767.]

2. An entry by a derelict vessel, brought in by salvors, without the consent of her owner or master, or of their agents, does not work her forfeiture under those acts.

[Cited in U. S. v. Curtis, 16 Fed. 189; Merritt v. One Package of Merchandise, 30 Fed. 197; The Cargo ex Lady Essex, 39 Fed. 767.]

3. A suit cannot be sustained in admiralty in rem, to enforce the payment of duties to the United States.

[Cited in U. S. v. Five Hundred Boxes of Pipe, Case No. 15,116.]

4. Goods saved from a wreck and brought within the United States, are subject to import duties, under the acts of congress of April 20th, 1818, and March 1st, 1823 (3 Stat. 433, 729).

5. Whether they would be so at common law, quere.

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

6. The nature of salvage considered. and the principles regulating its amount enumerated.

[Cited in The Galaxy, Case No. 5,186; The John Wurts, Id. 7,434; The Neto, 15 Fed. 821.]

7. The practice of calling in seafaring men to assist. the judgment of the court, has never been sanctioned in this country.

8. The rate of salvage in cases of derelict is seldom more than one-half of the net proceeds of the property saved. Two-thirds of the whole proceeds have sometimes been allowed. but the whole proceeds are never allowed unless their amount is so small that less would be an inadequate compensation.

[Cited in The Carl Schurz, Case No. 2.414.]

9. In awarding salvage upon a foreign vessel, courts in this country will regard the rates of allowance in the courts of the owner's country.

10. Import duties upon wrecked property are to be paid out of the gross proceeds. before deducting salvage, and are not to be charged exclusively on the owner's share of the salvage.

11. The relative claims of the actual salvors, and of the owners of the salving vessel and of its cargo, considered.

[Cited in The Comanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 473; The Persian Monarch, 23 Fed. 823; Compagnie Commerciale de Transport v. Charente S. S. Co., 60 Fed. 926.]

12. The duties of a master and of his crew in relation to saving derelict property, considered.

13. In this case, two-thirds of the proceeds of the property saved. after deducting the import duties, was given to the salvors. Two-thirds of the salvage was awarded to the owners of the salving vessel and of its cargo, and the remaining one-third was divided equally among the salvors, the master receiving no more than was received by each of the crew, and by a passenger who did duty as a sailor. Costs were decreed out of the proceeds in court, after deducting salvage.

[Cited in Markham v. Simpson, 22 Fed. 745.]

The ship Waterloo, of London, was discovered, on the 27th of August, 1828, by the brig Merced, in latitude 34° N., longitude 75° W., abandoned at sea. The Merced was bound from Havana to Cadiz, but, leaving her course, she, with great difficulty and danger, towed the Waterloo into the harbor of New-York, where they arrived on the 12th of September. The ship and cargo were thereupon libelled, on the 16th of September, by Peter Harmony, the owner, and Eliphalet Kingsbury. the master, of the brig, in behalf of themselves and of all others concerned, to secure the payment of salvage. Against this libel, three claims and answers were interposed. The first was by the district attorney of the United States, and claimed that the ship was forfeited to the United States, under the 1st section of the act of April 18th, 1818 (3 Stat. 432). which enacts, that from and after the 30th day of September (1818), the ports of the United States shall be and remain closed against every vessel owned, wholly or in part, by a subject or subjects of his Britannic majesty, coming or arriving from any port or place in a colony or territory of his Britannic majesty, that is or

shall be. by the ordinary laws of navigation and trade, closed against vessels owned by citizens of the United. States; and, that every such vessel, so excluded from the ports of the United States. that shall enter or attempt to enter the same in violation of the act, shall, with her tackle. apparel and furniture, together with her cargo on board such vessel, be forfeited to the United States. The answer alleged, that the Waterloo was owned by British subjects, and came from a port that was, by the ordinary laws of navigation and trade, closed against vessels owned by citizens of the United States, to wit, from Annatto Bay, in Jamaica. and entered the harbor of New-York in violation of the act, whereby she, her tackle, &c., and cargo became forfeited to the United States. The answer also claimed, that if the Waterloo and her cargo were not forfeited for the cause above stated, her cargo was subject to duties, and prayed a decree accordingly. The second claim and answer were interposed by the British vice-consul, in behalf of the unknown owners, praying a sale of the vessel and cargo, and that the proceeds, after payment of salvage to the libellants, might be decreed to be paid to the claimant. The third claim and answer were interposed by George and Henry Barclay, as agents for the underwriters at Lloyd's, in London, and for insurers at Liverpool and Glasgow, in behalf of whomsoever of their principals it might concern, praying that the balance of the proceeds of the sale of the ship and cargo, after deducting salvage, &c., might be detained by the court a reasonable time. until the rights of their principals could be ascertained. They also alleged that they had bonded the duties, and paid charges and expenses, and prayed that they might be decreed to be paid out of the proceeds. On the 6th of October. a venditioni exponas was issued to the marshal, returnable on the 19th. The ship and her cargo were sold for $39,-262.19. which sum was deposited in court.

On the 15th of October. a second libel was filed by the district attorney against the ship, and also an information against her cargo, claiming a forfeiture of the same for a violation of the act of April 18th. 1818, and of the supplementary act of May 15th, 1820 (3 Stat. 432, 602). Separate claims and answers were filed by all the other parties. denying that any forfeiture was incurred, and alleging the substance of their former pleadings. On. the 11th of November, by the consent of all parties, an order issued to the marshal to pay to the collector the duties upon the ship and cargo, amounting to nearly $22.000. The evidence in the case consisted of the depositions of the crew of the Merced, and of Captain Driscoll. master of the Orient, who had boarded the Waterloo before the Merced came up. but abandoned her, thinking it impossible to get her into any port. He stated that Bermuda was the nearest place, but that it would have been

about as hazardous to have taken the Waterloo there, as it was to take her to New-York. The difficulty and danger of reaching New-York with her were described by the crew of the Merced to have been very great. The other facts in the case are sufficiently set forth in the opinion of the court.

James A. Hamilton, Dist. Atty., for the United States.

Francis B. Cutting, for Kingsbury.

David B. Ogden, for Harmony.

William Betts, for the Barclays.

Hamilton Wilkes, for the British vice-consul.

BETTS, District Judge. The two claims of the United States, first to a forfeiture of the ship and of her cargo, or secondly, to a satisfaction of the duties charged upon them, will be first disposed of. The argument on the part of the United States is, that the ship and her cargo being British property, and coming last from a port closed to the United States, their entry here is made against the direct terms of the statute, and that, as congress have not made an exception of any description of cases, this property must incur the forfeiture declared by the act. The court cannot accede to this interpretation and application of the statute. There are certain principles inherent in penal legislation, which necessarily qualify or restrain its enactments, whether they are expressed in terms or not. When the violation of a law is supposed, it is always intended that there is a free agent, acting voluntarily. Courts will, accordingly, in the construction and execution of penal laws, supply those exceptions or qualifications which are presumed to be within the contemplation of the legislature as always accompanying such enactments. The William Gray [Case No. 17,694]; Sheppard v. Gosnold, Vaughan. 159, 169; Reeves, Shipp. 203–207. Although, therefore, the entry of the vessel and of her cargo are interdicted, and the forfeiture is imposed upon both, yet this form of enactment is to be understood to signify a voluntary navigation of the ship into our waters. Any other construction would lead to the revolting conclusion, that a vessel and cargo cast as wrecks upon our shores, might nevertheless be forfeited for sheltering themselves in a port closed against them by the policy of trade. This would be to constitute a man's calamities his offence, and to convert the acts of God into causes of punishment and confiscation.

It is, however, contended, that if the statute has regard to voluntary entries, that made by the Waterloo in this case was entirely so: and that nothing can excuse her having been brought into a port of the United States, unless she is shown to have been brought there from absolute necessity. The proofs undoubtedly show that, in the state of the wind, New-York was the most convenient port to make with the wreck. But Bermuda was much nearer, and it is by no means evident that any

greater hazard would have been encountered in taking her to that island. New-York was clearly the port of choice, and not of necessity, as it was determined to bring the wreck here when she was taken possession of, many hundred miles distant; and, if a port strictly of necessity had been sought, no doubt the effort would have been made to run into Norfolk, or even Bermuda. Under these circumstances, it is insisted, that if a case of urgent and compulsive necessity might have protected the entry, no such case existed, and that bringing this vessel and her cargo here must be taken to have been a voluntary and designed importation. There is force in these suggestions, and they would undoubtedly be conclusive if the original ship's company of the Waterloo, or any person entitled to represent her owners, had concurred in the act. But it is to be borne in mind, that the Waterloo, when found, was deserted by her crew, and was brought into the United States by the salvors, at their own instance, without the concurrence or knowledge of the owners or of their agents. To condemn the vessel for this cause, would be to render the owners responsible for the acts of others having no authority under or connection with them. The supreme court have repudiated, in strong language, a construction of our revenue laws which would thus punish one man for the offences of another, over whom he could have no control. Peisch v. Ware, 4 Cranch [8 U. S.] 347, 365. The doctrine is carried out and applied, in a variety of instances, to the exemption of property which would be forfeited if it had been placed in the predicament in which it is found, by the act of those who were entrusted with it by the owner, or who would have to bear themselves the consequences of their own misconduct. The Bello Corrunnes, 6 Wheat. [19 U. S.] 152; 651 Chests of Tea v. U. S. [Case No. 12,916]; s. c., 12 Wheat. [25 U. S.] 486. With regard to the owner of the ship and cargo, it would, therefore, make no difference whether they were navigated into an inhibited port as derelicts, by strangers and salvors, or were cast upon our coasts by tempests and saved as wrecks from the sea. The law of confiscation and forfeiture would not touch them in either case.

Neither can a suit be sustained in the court of admiralty against the ship, or an information against her cargo, to enforce the payment of duties (U. S. v. Three Hundred and Fifty Chests of Tea, 12 Wheat. [25 U. S.] 486), because the jurisdiction of this court in rem, in revenue cases, embraces only seizures for forfeitures under the laws of impost, navigation and trade, as conferred by the 9th section of the judiciary act of 1789 (1 Stat. 76). The prosecutions on the part of the United States are accordingly both dismissed.

The question was raised and discussed at large by all parties, whether this cargo was subject to duties. In strictness of law, they were concluded upon this point. The parties had directly or impliedly assented to

the order previously made in the case by the court, by which payment of those duties was directed, and such assent would undoubtedly preclude them from afterwards calling in question the correctness of the decree. The Concord, 9 Cranch [13 U. S.] 387. Still, as it may be desirable to the parties to review on appeal all the proceedings in this court, and to be put in possession of the views which have governed its decisions, and, as no formal opinion was delivered when that order was made, it may be proper, at this time, to state summarily the reasons which influenced that decision. No doubt, according to the construction of the English laws of impost, wrecked property was originally exempted from the payment of duties. 1 Moll. 392; Sheppard v. Gosnold, Vaughan, 159, 164; Com. Dig. "Trade," C, 3. This was upon the common law notion, that wrecked property belonged to the king, and that the king was not chargeable with customs, as they were, in supposition of law, paid to himself, and he would not take a small part, by way of duty, out of that which was all his own. 1 Moll. 392. Lord Chief Justice Vaughan further suggests, that goods cast upon shore as wreck could not be deemed to be imported as merchandise, and to be embraced by the statutes relative to customs. Sheppard v. Gosnold, Vaughan, 159, 164. This consideration influenced the decision of the king's bench, in Courtney v. Bower, 1 Ld. Raym. 501, and, no doubt, in a degree, led to some of the suggestions thrown out by the court in Peisch v. Ware, 4 Cranch [8 U. S.] 347. Whether the decisions in England should not be limited to cases of wreck at common law, where the goods are thrown on shore by the sea, would only become a material inquiry in case we were to be governed in this matter by the common law rule. The statute of 5 Geo. I., c. 11, has since placed wrecked goods, in respect to duties, upon the same footing with goods regularly imported, and I think that the acts of congress substantially accomplish the same end here. Judge Winchester, who has left behind him a high reputation as a learned and discerning judge, very distinctly intimates his opinion, that goods saved from a wreck at sea, and imported into this country, are not chargeable with duties. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; Peisch v. Ware, 4 Cranch [8 U. S.] 354, note. The courts above, in reviewing his decision in the case of The Blaireau, did not touch that particular point. The proposition was advanced arguendo by counsel in the subsequent case of Peisch v. Ware, 4 Cranch [8 U. S.] 347, but the decision of that case did not necessarily lead to the consideration of the general proposition, and it was not adverted to by the court. The court decided, that goods wrecked and brought into our ports are not liable to forfeiture for not having been regularly entered in conformity to the revenue laws. Manifestly, it might often be

impossible for strangers bringing property in, as wreck, to comply with the requisitions of the custom-house in making a regular and perfect entry of the goods; and, therefore, it would be a most harsh application of the provisions of those laws, to condemn the property for that cause. Whether, if the question rested upon the construction of the revenue laws, the principle would not extend further, and exempt such property from liability to duties, I do not think it indispensable now to determine, as, in my judgment, the 15th section of the act of April 20th, 1818 (3 Stat. 437), reënacted by the 21st section of the act of March 1st, 1823 (3 Stat. 736), removes the formal difficulty of making entry, and places goods saved from wreck upon the same footing as if imported in a regular course of trade. By providing that before goods taken from a wreck shall be admitted to entry, they shall be appraised, the manifest implication of the act is, that they are to pay duties; and, without pursuing the discussion upon general principles, which, in my opinion, would lead to the same conclusion, I shall declare that this ship and her cargo have been rightfully charged with duties. If there is a seeming harshness in drawing a revenue from property so situated, either in respect to the English owner or to the salvors, it is worthy of remembrance that a like rule would be applied to American property taken under similar circumstances into a British port. Pope, Merch. Guide, 82, 338.

The inquiry next in order is the amount of compensation to be awarded to the salvors. There is no evidence before the court that the owner of the Merced is not also owner of her entire cargo. In the distribution of salvage money, he will be treated as such. The salvors, then, as between themselves, will stand in two classes: 1st. The owner of the Merced; 2d. Her master and crew. Although these parties unite in the action against the ship and her cargo, and have a common interest in the amount to be recovered, yet, in the ultimate division of that amount, their interests are separate, if not hostile, to each other.

The main question is, how much salvage shall be allowed? It is obvious that the vicissitudes of nautical pursuits must have brought this inquiry frequently before the courts. It has been the subject of adjudication from the earliest history of judicial proceedings. But, as each case comes clothed with variant circumstances, it has been thought impracticable to establish general rules which may with justness be applied to all cases. The want of fixed principles of compensation is the source of serious perplexity to courts and of uncertainty to parties in interest. There are marked fluctuations in allowances, where the cases would seem to require no discrimination. This occurs not only between different tribunals, but the books supply us many instances in which enlightened and cautious judges will reward, at

one time, with a liberal hand, services which, at another, are compensated sparingly. These diversities arise from the effort of the law to have each cause, in salvage claims, disposed of upon its own particular merits, and, with this view, the whole matter is referred to the discretion of the court which acts in the cause. Yet, probably, nowhere can judicial discretion be less intelligently and satisfactorily exercised than in matters of salvage. The judge must weigh facts, and estimate probabilities, of the true import or bearing of which he will generally, from his education and pursuits in life, be less competent to form correct opinions than in almost any other branch of his duties. This would be so, if he could be an eye-witness to every occurrence in the case, as he could but imperfectly estimate risks and services so foreign from his own habits and experience. He has not, however, the satisfaction of knowing that he is called upon to judge of facts as they actually occurred. He must gather the information on which he acts from those who have every inducement to conceal or discolor parts of the transaction, and who would be usually restrained by no fear of contradiction or exposure. Inflamed representations of perils and sufferings must accordingly be expected, particularly when addressed to one who would rather be inclined to apprehend dangers in situations and exposures with which he is not familiar, and thus to liberally value services devoted to the rescue of property in that condition. The English court of admiralty has endeavored to obviate this pressing inconvenience by calling to its aid seafaring men, who can properly appreciate the facts presented, and advise the court to such judgment as the nature of the case may require. This mode of procedure has never been sanctioned in this country. There are, however, certain general considerations which enter into the estimate made by courts of the services to be rewarded—as, 1st. The situation of the salvors, and their conduct and exposures; and with these is properly connected a regard to the value of the ship and cargo employed by them in effecting the salvage; 2d. The situation of the property saved, and the probabilities of its preservation without the assistance of the salvors; and 3d. A liberal public policy, which, on the one hand, holds out encouragements to mariners to aid in the preservation of property, by securing to them generous rewards, and, on the other, exercises a jealous and vigilant protection over the ship-owner and merchant, to shield them from exorbitant demands. It is through influences so important and conflicting that courts are to ascertain and settle the rate of reward, without having any more definite criterion fixed by the law to guide and correct their deliberations. There can be no surprise, therefore, at the different results to which men of equal justness of purpose arrive, nor that the books should abound with cases filled with learning on this subject, yet leading to no plain, practical results. It is unnecessary to rehearse the doctrines that have been advanced and the decisions that have

been made, as they do not profess to fix an exact standard or measure of compensation, or to do more than offer suggestions and arguments which may be usefully consulted in future cases. The English and American authorities, which discuss this topic most instructively, are collected in Judge Story's late edition of Abbott on Shipping.

The tendency of a preponderance of the decisions is, manifestly, to consider one-half of the nett proceeds the ultimatum of salvage to be allowed in cases of derelict. L'Esperance, 1 Dod. 46, 49; Rowe v. The Brig [Case No. 12,093]; Concklin v. The Harmony [Id. 3,089]; Morehouse v. The Jefferson [Id. 9,793]. Still, two-thirds of the whole proceeds have been allowed. The Jonge Bastiaan, 5 C. Rob. Adm. 322. And the decisions of the English admiralty will have more consideration in the present case, as our courts, in awarding salvage for the preservation of the property of foreigners, have regard to the rates of allowance which obtain in the courts of the owner's country, it being the policy of our tribunals to observe, in this respect, a rule of reciprocity. Armroyd v. Williams [Case No. 538]; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. The claims of the libellants in this case, if allowed, would absorb the whole proceeds of the ship and cargo. This the courts will not sanction, except in cases where the property saved is so small in value as to be necessarily all required to cover charges and make any compensation to the salvors. The doctrine of salvage derives its support from the consideration, that however munificent the reward may be to the salvor, something, a residuum, is still secured to the owner. His rights are not to be deemed derelict. One of the most satisfactory reasons for allowing a discretion to the courts in this respect is, that they can reward not only according to the merit of the services, but also in proportion to the amount saved. I have met with no instance in which the whole amount saved, and an amount equal to what was preserved in this case, has been all of it taken from the owner. Courts, in so doing, would be reinstating the rule of nature, or rather of barbarism, in devoting to the first finder whatever property the exigencies of the owner had wrested from him or compelled him to desert.

The main effort of the libellants' counsel has been to throw the whole of the duties on the owners, and leave the salvors the same degree of compensation that would be allowed if the gross proceeds of the property represented its nett avails. Without pursuing the train of reasoning which has satisfied my mind that there is no just ground for exonerating the salvors from sharing in the charge of duties, it will be enough to say, that nothing more can be considered saved in this case, out of which the salvors may be rewarded, than what remains after satisfaction of the duties. Whether that proportion goes to the government, as the price for the enjoyment of the salved property, or perishes at sea, the residue is all that the exertions of the salvors have placed at the

disposition of the court. Concklin v. The Harmony [supra]. [2]

The duties were nearly $22,000, which exceeded one-half of the gross proceeds of the ship and cargo. The remainder composes the sum which is now to be distributed between the salvors and the owners. The court has no doubt that the owners should be required to disburse a large proportion of this. In respect to them, the salvage was of the most meritorious order. Independent of the evidence of the salvors, the testimony is full and satisfactory, that the Waterloo, when fallen in with, was in the most perilous situation. Captain Driscoll thought that any attempt to save her would be hopeless. She lay in a rough sea, at a great distance from any port, nearly dismantled. It was scarcely possible to board her, on account of the noxious and stifling air in her hold and cabin. She was rapidly sinking, having then made about twelve feet of water, and the wind at the time was blowing heavily. The crew had abandoned the wreck three days before, as being then in a desperate condition, and, no doubt, but for the intervention of the salvors, the vessel and her cargo would all have perished in a very few hours. This, therefore, as it respects the owners, shows that their property was rescued from dangers which must immediately have been fatal to it, and against which no premium short of its value would have obtained for them an indemnity. Nor could this have been done without great exposure, and the most energetic exertions on the part of the salvors. These circumstances—the desperate situation of property, and the personal danger incurred by the salvors—are always recognised as demanding a liberal award of salvage. Admitting the perils and intrepidity of the ship's crew to be extravagantly exaggerated, in the relation given by themselves, yet there is extrinsic evidence enough to satisfy the court that the wreck could not have been brought into port without uncommon exertions and perseverance and no small degree of hazard to their lives. The Waterloo was not in a condition to be navigated by herself, nor could the Merced, with safety, have spared hands enough to man her. Cables were accordingly passed to her from the Merced, and she was towed in, a sufficient number of men being put on board to work the pumps, and do the labor indispensably necessary to keep the wreck afloat. This, it is stated, is always a dangerous proceeding, and, in vessels of the relative size of these (the Waterloo being

[2] In The Jubilee, decided in 1826, but not reported until 1840 (3 Hagg. Adm. 43, note), in a very meritorious case, the court awarded two-thirds as salvage, and ordered sufficient property to be sold to pay salvage and expenses, duty free. But a sale of cargo, duty free, in respect to salvage, is no longer allowed. 4 & 5 Wm. IV. c. 89, § 4. It would seem, therefore, that salvors would now pay duties on their share, or, which is the same thing, that salvage would be awarded out of what remains after duties on the gross amount are paid.

about double the burthen of the Merced), must be attended with the most imminent risk. When Captain Driscoll, of the Orient, parted company with them, the wind was high and squally, and from fourteen to fifteen days were consumed before the wreck made land. Connecting with these facts the relation given by all the libellants, on their examination, that the weather continued tempestuous during the whole time, and that they encountered three severe storms, and it must be manifest that efforts of dauntless courage and constancy must have been put forth to secure this property. There is, then, a manifest propriety in charging the owners liberally, in proportion to the value so rescued; and I shall decree that two-thirds of the gross amount, after the deduction of duties, be paid to the salvors.

The manner in which this sum shall be distributed between the owner of the Merced and her master and crew, will next be investigated. Upon this branch of the case the testimony of the libellants may be received with less distrust, for, in so far as it proves that unceasing and extraordinary exertions were necessary on their part to save their own vessel and the wreck, it magnifies, in the same proportion, the importance of the Merced to the success of the enterprise. The toil and the peril were the crew's, but they had nothing else in jeopardy. The owner of the Merced had in risk upon the adventure a vessel and cargo, worth nearly double the wreck and her cargo, and that vessel was the essential instrument by which the salvage was made, and without which, in the crippled condition of the Waterloo, it could not have been effected. In this point of view, the claims of the respective parties upon the fund would seem to stand nearly in equilibrio; and probably the master and crew would accede to the propriety of an equal division. The court cannot, however, on this inquiry, lose sight of the situation in which the master and crew of the Merced stood in relation to her owner. He in no respect assented to this undertaking. It is not pretended that any discretionary power was given by him to use his vessel and cargo for purposes of this character. The master and crew took upon themselves to employ his property in an enterprise for their own profit. If successful, they expected to reap a rich reward; and, if otherwise, and their own vessel should be lost, they would run no other risk than that of their personal safety. They were in charge of property valued at about $72,000, the whole of which was put in most imminent hazard by this act. The insurances upon the vessel, cargo and freight were all forfeited by the deviation made to rescue the wreck. Nor does the case stand relieved by the consideration that the libellants were impelled by the loftier motive of saving human life. It was, on their part, a mere enterprise for securing wrecked property, with a view to their own emolument. These remarks apply to the

whole crew. The service was not enforced upon the seamen by the orders of their superior. The master had no authority, as they well knew, to exact it. He did not assume to do so. The crew were convened and fully consulted, and, after well considering the matter, gave their consent to the undertaking. With an earnest anxiety to encourage all efforts founded in humane motives, or tending to lessen the misfortunes of those whose property is abandoned at sea, courts cannot overlook the paramount duty of a ship's company to avoid every act which may unnecessarily lead to an exposure, to injury and loss, of the vessel and cargo committed to their charge. The interests of commerce exact the strictest fidelity from mariners in the performance of the trusts reposed in them. Their whole skill must be devoted to the service, and they well know that they have no right to depart from this duty, except under the influence of a controlling necessity. Had the deviation in this instance been made with a view to save life, I should adopt the sentiment of an eminent judge,—Bond v. The Cora [Case No. 1,621],—and say, that I would not be the first to decide that such deviation should compromit any right of the owner or freighter. Yet, when no such motive incites to the act, and no justification for a deviation exists, I cannot think that the interests of commercial navigation would be subserved by placing in the way of sailors temptations to abandon their immediate duty, in pursuit of enterprises and adventures of salvage. If the court should encourage seamen to put in imminent peril property worth $72,000, with a view to rescue $40,000 found derelict, it could not forbid their risking an Indiaman or a Guarda Costa, of ten times that value, for an object of still less importance. It is apprehended that the promulgation of such a doctrine would tend to unsettle the fidelity of seamen, and work measureless mischief to the security of navigation and trade. Whatever, then, the merits of the service may have been in relation to the owners of the Waterloo, the preceding observations indicate the opinion of the court that the crew of the Merced stand in a much less meritorious light, upon their claims, in competition with those of the owner of that vessel. If their dereliction of duty detracts so greatly from the reward they might otherwise receive, the consideration ought to have a still more important influence in the case of the master. He not only encouraged and instigated the crew to a breach of duty, but, on his own part, more directly betrayed the confidence of his employer, and violated his obligation to his vessel. He put his vessel and her valuable cargo to an excessive and most improvident risk; and he must also have been conscious that this abandonment of the business in which he was employed, to engage in another so incompatible with the safe fulfilment of his instructions, might

have prejudiced his owner to many times the amount of all which could be realized in salvage. It is well known to every intelligent ship-master, that his failure to execute the charge imposed upon him will usually affect his principal not only to the extent of the shipment, but that a series of mercantile arrangements is usually framed upon a voyage, which may be disconcerted, to the ruin of his owner. The master of the Merced had no right, in judging of the probable advantage his owner might derive from the salvage of the wreck, to estimate only the possibility of the entire loss of the brig and of her cargo in the adventure, but he should also have contemplated the consequences to his owner, if he failed to realize his funds in a European port, where they were destined, and would undoubtedly be anticipated. The bearing this might have upon his owner's credit and fortune, ought not to have been lost sight of by the master, who was relied upon to fulfil those expectations. If these considerations were too remote and contingent to be objects of attention at the time the master decided to undertake this rescue, he ought at least to have been certain, that if the enterprise should result unfortunately, and his own vessel be lost, his owner would be indemnified to that extent. Yet, disregarding this plain dictate of prudence, he embarked in a project which destroyed the protection of any insurance his owner might have had, and substituted nothing in its place beyond his own personal responsibility. This is not shown to have been of any value. Although this extraordinary disregard of obligations to their owner by the master and seamen might perhaps justify the court in withholding all compensation from them personally, and transferring the whole salvage to the owner of the Merced, as his indemnity for the loss of the voyage, yet I am rather inclined to admit them to a moderate participation in the salvage, and shall therefore decree the payment of one-third part to them and two-thirds to the owner.[3]

I shall not discriminate, in the distribution of the salvage among the ship's company, between the master and the common sailors. If the superior experience and seamanship of the master were most serviceable in securing the ultimate safety of both vessels, so the dereliction of duty on his part was more inexcusable than that of his associates. Without his approbation, they could not

[3] In no previously reported case does more than one-half seem to have been allowed to the owner of the salving vessel. In The Henry Ewbank [Case No. 6,376], Concklin v. The Harmony [Id. 3,089], The Cora [Cases Nos. 1,620 and 1,621], and Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, 269, one-third was given to the owner. In Taylor v. The Cato [Case No. 13,-786], The Cumberland [Id. 3,470], The Waterloo, 2 Dod. 433. 443, and The Columbia, 3 Hagg. Adm. 428, 431, one-half was given to the owner.

have abandoned the voyage in which they were engaged, to enter upon this undertaking, and there is no reason to suppose that, unless persuaded by him, they would have attempted or desired to do so. Besides, he chose, in order to secure his prize, to level himself to the situation of his crew. His witnesses testify, that he so weakened the force of the Merced as to be obliged himself to go aloft and to do the duty of a common sailor in all other respects, and he also imposed the like service upon the cook. The court, therefore, deems it proper to mark this case, by allotting to the master only the compensation of a common seaman, and to the sailors such reward as will barely show that the court does not disregard the bravery and perseverance with which they devoted themselves to the preservation of both vessels after they had embarked in the enterprise. Had these high qualities been displayed in a case free from the improprieties that accompanied this undertaking, the court would have felt great satisfaction in bestowing upon them the most liberal reward. If the master had been the owner of the Merced, or if she had been of very trifling value compared with the wreck, the court would have experienced the sincerest gratification in compensating him and his crew according to their respective merits in planning and prosecuting the salvage service.

The reasons which have led the court to the conclusion now adopted are already sufficiently detailed. It only remains to add, that there appears, from the proofs, to be no occasion for making a distinction in the apportionment of the salvage amongst the seamen. Each was required to do all that his strength would admit, on board of both vessels. I shall accordingly decree that the one-third part of the salvage be divided among the ship's company (including the passenger who performed the duty of a sailor with the others), share and share alike. Out of the residue of the proceeds in court, after deducting salvage, the clerk will pay the taxed costs of the libellants in their suit, and also in their answers and claims to the actions on the part of the United States, and the taxed costs and disbursements of the marshal, and the taxed costs of the clerk. The British consul having properly interfered to protect the interests of British subjects who might be interested, his taxed costs are also to be satisfied; and, it being made to appear to the court, that those interested in the Waterloo and her cargo have since sanctioned the steps taken by the Messrs. Barclays in behalf of the British underwriters, the clerk will further pay the taxed costs of those parties. The residue of the fund will remain in court, to abide its further order, on the application of those who may be entitled to it. Decree accordingly.